**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| GRIXI MENDEZ, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. H-10-1755 |
| | § | |
| ANADARKO PETROLEUM | § | |
| CORPORATION, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Grixi Mendez sued Anadarko Petroleum Corporation in Texas state court, seeking benefits under the Jones Act, 45 U.S.C. § 51, *et seq.* (Docket Entry No. 1, Ex. C). Mendez alleged that he sustained severe injuries while working on Anadarko's RED HAWK Spar in the Gulf of Mexico and that he was a seaman covered by the Jones Act. Anadarko removed on the basis that Mendez was not a Jones Act seaman because the RED HAWK Spar was not a vessel. (Docket Entry No. 1). Mendez moved to remand, (Docket Entry No. 26), and Anadarko responded, (Docket Entry No. 28). On October 29, 2010, at the conclusion of a hearing at which counsel presented oral argument on the amended motion to remand and response, this court held that based on the pleadings, the motions and responses, the extensive record evidence, the arguments of counsel, and the applicable law, the RED HAWK Spar was not a vessel for the purposes of the Jones Act and remand was not appropriate. In addition to the reasons stated on the record, and in accordance with Mendez's request for written findings and conclusions, this court now enters findings of fact and conclusions of law that the RED HAWK Spar is a permanently moored work platform designed to process gas extracted from the seabed and is not practically capable of marine transportation as defined under

the applicable case law. As a result, Mendez is not a Jones Act seaman because he had no connection with a vessel in navigation.

The reasons for these findings and conclusions are set out below.

## I.  Background

Mendez, an Anadarko employee, was injured while working on the RED HAWK Spar on April 8, 2008. Mendez began working on the RED HAWK Spar on November 8, 2004. He did not work for Anadarko anywhere else but the Spar. After his injury, Mendez applied for, and received, longshore worker's compensation benefits.

The RED HAWK Spar is a floating gas-production platform moored in ocean water 5,000 feet deep approximately 210 miles from Sabine Pass, Texas. Unlike a traditional oil or gas production platform, which sits on rigid supports that extend to the sea floor, a spar floats on the ocean's surface, moored to large anchors in the seabed below. The RED HAWK Spar has been moored in Red Hawk Field at Garden Banks blocks 876 and 877 since shortly after its construction in 2004.

The RED HAWK Spar differs from many other oil and gas production spars in that it is a cell spar. It does not have a single hull but rather different, smaller "tube" cells that together serve as the hull, allowing for greater stability. The RED HAWK's hull is 560 feet long. The hull is comprised of six twenty-foot diameter tubes surrounding a seventh tube. The tubes are "bundled" to form the equivalent of a hull that is sixty-four feet in diameter. The RED HAWK Spar has no means of self-propulsion.

The Spar's work platform, consisting of three individual decks, sits on top of the hull. The RED HAWK Spar supports a twelve-man living quarters, crane, boom, heledeck, power generators,

production equipment, mono-ethylene-glycol recovery unit, heaters, glycol storage tanks, utilities, pipeline launchers and receivers, and safety and survival capsules. The Spar deck is 55 feet by 74 feet and the main and production decks are 105 feet by 135 feet.

In 2004, the Spar was floated into place on its side, righted, and attached to the anchors by the six mooring lines. When the Spar was installed, the suction anchors were first put in place, then the hull was towed and upended by flooding the lower segments. The hull was then moored. The deck was lifted onto the hull and fixed in place. The lines were then installed.

The RED HAWK Spar is secured to the ocean floor by a series of six single-point anchor moorings, which extend in a spread platform from the hull. Each mooring is comprised of a chain and polyester line 78 feet long. Each line is anchored to the sea floor with a suction embedment anchor that is approximately 18 feet in diameter. The mooring lines are permanently taut so that the RED HAWK Spar cannot move laterally, to maintain stability. In addition to these mooring lines, an underwater infrastructure of flow lines and export pipeline systems, as well as umbilicals extending from the Spar to the subsea wellheads, used to transport oil and gas to shore-based facilities attach the Spar to the ocean floor. A pipeline extends from the Spar to the Pelican Gas Plant in Patterson Louisiana, by way of the VR-397 platform. The gas comes from the well heads on the sea floor, up through the flow lines (steel pipes), then to the platform. Once on the platform, a separator takes the liquids out, and the gas flows to shore through a sixteen-inch steel pipeline.

The RED HAWK Spar was intended to remain in place for the productive life of the field, which was anticipated to be years. Production began on July 19, 2004. The field, however, proved less productive than anticipated. After four years, on August 17, 2008, Anadarko stopped extracting

from the Red Hawk field. The Spar has not, however, been moved. Anadarko has no plans to move the RED HAWK Spar.

Anadarko commissioned a study on the feasibility of having the Spar moved to another field approximately 100 miles away. The study concluded that doing so would take approximately 50 days and cost over $42 million. The actual movement of the Spar would take only 2 to 4 of those 50 days; the greatest time and difficulty were presented by preparing to move it and modifying it to anchor it in the new location. Only the Spar itself would be moved; the mooring system, and the risers and umbilicals, would all have to be severed or disconnected. The mooring system would either be disposed of or left in place. Anadarko would have to build a new mooring system at the new location if it decided to have the Spar moved. There are no plans to do so.

Some of the Spar's features, including "tow bollards,"[1] and the shape of its hull, could facilitate movement from one offshore location to another. But the work and expense needed to unmoor it, prepare it for transportation, and to reattach it to a new location, make that extremely difficult and expensive. As a result, the Spar was designed to remain permanently moored to the seabed and stationary for the life of the oil and gas production field. Although the RED HAWK field stopped production years earlier than expected, there are, as noted, no plans to move the Spar.

The Spar also has some features commonly associated with maritime life, including life preservers, ring buoys, and life boats. Employees on the RED HAWK Spar must perform periodic evacuation drills under Coast Guard rules, and the Guard Coast classifies the Spar as an "industrial

---

[1] The parties dispute whether these bollards are actually for towing. Because the facts must be interpreted in favor of remand, this court assumes that their purpose is to facilitate towing.

vessel." These features are, however, consistent with a fixed structure permanently moored far offshore, not merely with vessel status.

The Coast Guard designated the RED HAWK Spar as an "industrial vessel," but the Coast Guard Certificate of Inspection ("COI") also states that the Spar is "considered a floating facility with passive ballast systems." The COI states that the RED HAWK is not permitted to carry passengers. The COI also notes under the "Route Permitted and Conditions of Operation" section that the Spar is "[l]imited to the Gulf of Mexico – Garden Banks Block 876, not on international voyage. This unit is a floating production system of the cell spar design using a synthetic line mooring system, and is considered a floating facility with passive ballast systems . . . ."

The issue is whether, given these findings, the RED HAWK is a "vessel."

## II. The Legal Standard

A defendant has the right to remove a case to federal court when federal jurisdiction exists and the removal procedure is properly followed. *See* 28 U.S.C. § 1441. The removing party bears the burden of establishing that a state court suit is removable to federal court. *See Carpenter v. Wichita Falls Indep. Sch. Dist.*, 44 F.3d 362, 365 (5th Cir. 1995) (citation omitted). Doubts about the propriety of removal are to be resolved in favor of remand. *Waldrop v. Penn Treaty Network Am. Ins. Co.*, No. G-08-0149, 2008 WL 3287148, at *2 (S.D. Tex. Aug.6, 2008) (citing *In re Hot-Hed Inc.*, 477 F.3d 320, 323 (5th Cir. 2007) (per curiam)).

Mendez brought his Jones Act claim in state court. When a plaintiff brings a case under the Jones Act, the defendant generally cannot remove the case to federal court. *Holmes v. Atl. Sounding Co.*, 437 F.3d 441, 445 (5th Cir. 2006). If a Jones Act claim is fraudulently pleaded, it is removable. *Id.* "[A] district court . . . may use a 'summary judgment-like procedure' to dispose of the assertion

that the Jones Act claim was fraudulently pleaded." *Id.* (quoting *Burchett v. Cargill, Inc.*, 48 F.3d 173, 175 (5th Cir. 1995). "The court may deny remand where, but only where, resolving all disputed facts and ambiguities in current substantive law in the plaintiff's favor, the court determines that the plaintiff has no reasonable possibility of establishing a Jones Act claim on the merits." *Id.* (quoting *Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 345–46 (5th Cir. 1999)).

"To maintain a cause of action under the Jones Act, the plaintiff must be a seaman." *Hufnagel*, 182 F.3d at 346. "Under the Jones Act, a 'seaman' is a term of art for an employee whose duties 'contribut[e] to the function of the vessel or to the accomplishment of its mission' and who has 'a connection to a vessel in navigation . . . that is substantial in terms of both its duration and its nature.'" *Cain v. Transocean Offshore USA, Inc.*, 518 F.3d 295, 298 (5th Cir. 2008) (quoting *Chandris, Inc. v. Latsis*, , 515 U.S. 347, 368 (1995)). "Whether an unconventional craft is a vessel is an issue that is generally resolved as a matter of law, although . . . 'at the margin, fact issues may be presented.'" *Holmes*, 437 F.3d at 445 (quoting *Manuel v. P.A.W. Drilling & Well Serv.*, 135 F.3d 344, 347 (5th Cir. 1998)). "Courts have long recognized a distinction between 'work platforms' that are designed for primarily stationary residence and true vessels." *Fields v. Pool Offshore, Inc.*, 182 F.3d 353, 357 (5th Cir. 1999) (citation omitted); *see also Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, (1969) ("[T]he Court has specifically held that drilling platforms are not within admiralty jurisdiction.") (citing *Phoenix Const. v. The Steamer Poughkeepsie*, 212 U.S. 558 (1908)).

The Fifth Circuit traditionally used a three-part test to determine whether work platforms were Jones Act vessels. *Fields*, 182 F.3d at 357–58. The test considered whether the craft was designed primarily to serve as a work platform, whether the structure was moored or otherwise secured at the time of the accident, and "whether the transportation function of the structure went

beyond theoretical mobility and occasional incidental movement." *Id.* Under this test, the Fifth Circuit held in *Fields* that a spar similar to the RED HAWK Spar was not a Jones Act vessel. Unlike other drilling rigs that were vessels, the NEPTUNE Spar would sit in its field until the field was exhausted. *Id.* at 358 (distinguishing *Manuel v. P.A.W. Drilling & Well Svc., Inc.*, 135 F.3d 344, 346 (5th Cir. 1998) (noting that the drilling vessel had been deployed at nineteen different sites over the course of two years); *Colomb v. Texaco, Inc.*, 736 F.2d 218, 221 (5th Cir. 1984) (involving a "highly mobile" submersible drilling barge "routinely" refloated and moved to the next location); *Blanchard v. Engine & Gas Compressor Svcs., Inc.*, 575 F.2d 1140, 1143 (5th Cir. 1978) (distinguishing a work platform from drilling barge rigs because there was no intention to move the platform "on a regular basis, as is done with submersible drilling rigs")).

As to the second factor, the *Fields* court noted that the spar's owner "at presumably considerable expense sunk massive (180 foot) pilings into the ocean floor," attached to the spar with "similarly impressive" chain lines. "[L]ike its sibling conventional fixed production platforms, the NEPTUNE Spar is further anchored in position by the underwater infrastructure of extraction and exportation pipes that transport the petroleum from wellhead to the platform and from the platform to the shore." *Fields*, 182 F.3d at 358. *See also Blanchard*, 575 F.2d at 1143 (a compressor building mounted on submersible barge was distinguishable from the structure at issue in *Hicks v. Ocean Drilling & Exploration Co.*, 512 F.2d 817, 823–24 (5th Cir. 1975) (in which the evidence was sufficient to sustain a jury finding that a submersible petroleum-storage barge sunk to the bottom and then connected to nearby platform by a pipe and catwalk, but not in any way affixed into the seabed, was a vessel because the barge was anchored with steel cables attached to fixed pilings); *Hemba v. Freeport McMoran Energy Partners, Ltd.*, 811 F.2d 276, 278 (5th Cir. 1987) (a rig

attached by pilings driven two hundred feet into the seabed was not a vessel). As to third factor, the court in *Fields* observed that the NEPTUNE Spar's only movement was between seven "closely packed wellheads to perform needed work." It concluded, "While there remains some theoretical possibility of more lengthy movement when the current field is exhausted, the mere possibility of movement so many years hence cannot render irrelevant the structure's current and long-term immobility." *Id.* at 359.

Since *Fields*, the Supreme Court has clarified the definition of "vessel." In *Stewart v. Dutra Construction Company*, the Court stated that a vessel "is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment." 543 U.S. 481, 497 (2005); *Holmes*, 437 F.3d at 448 ("*Stewart*'s definition of 'vessel' applies . . . to the Jones Act . . . ."). A vessel's primary purpose need not be navigation or transportation and it need not be in motion at the time of the seaman's injury. *Stewart*, 481 U.S. at 495–96. "A ship and its crew do not move in and out of Jones Act coverage depending on whether the ship is at anchor . . . ." *Id.* at 494. On the other hand, "a watercraft is not 'capable of being used for maritime transport' in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement." *Id.* at 495.

The Fifth Circuit has observed that the *Stewart* opinion resulted in a "significant broadening of the set of unconventional watercraft that must be deemed vessels." *Holmes*, 437 F.3d at 448. But the Fifth Circuit has also recognized that "there still exist limits on a potential plaintiff's seaman status under the Jones Act." *Id.* *Stewart* was careful to distinguish two precedents, *Cope v. Vallette Dry-Dock Co.*, 119 U.S. 625 (1887), and *Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.*, 271 U.S. 19 (1926), in which the Court found that the structures at issue were not

vessels. *Stewart*, 543 U.S. at 493. The Court emphasized that the floating drydock in *Cope* had been moored to the shore for twenty years, making it a "'fixed structure' that had been 'permanently moored,' rather than a vessel that had been temporarily anchored." *Id.* at 493 (quoting *Cope*, 119 U.S. at 627). "*Evansville* involved a wharfboat secured by cables to the mainland. Local water, electricity, and telephone lines all ran from shore to The wharfboat, evincing a 'permanent location.'" *Id.* (quoting *Evansville*, 271 U.S. at 22). The *Stewart* Court pointed to a Fifth Circuit case holding that a "floating casino was no longer a vessel where it 'was moored to the shore in a *semi*-permanent or indefinite manner" as an example of the "sensible" rule that "ships . . . do not remain vessels merely because of the remote possibility that they may one day sail again." *Id.* at 494 (quoting *Pavone v. Miss. Riverboat Amusement Corp.*, 52 F.3d 560, 570 (5th Cir. 1995)); *see also id.* (citing with approval *Kathriner v. UNISEA, Inc.*, 975 F.2d 657, 660 (9th Cir. 1992) (holding that a floating processing plant was no longer a vessel after a "large opening [had been] cut into her hull" making her incapable of moving over the water)).

In its first post-*Stewart* case, the Fifth Circuit considered whether a barge that served as a fifty-bed floating dormitory was a Jones Act vessel. *Holmes*, 437 F.3d at 443. The barge served employees during dredging projects. Tugboats would move the barge from project to project. *Id.* at 443–44. At the time of the accident, the barge had been moored for a month at Holly Beach, Louisiana. *Id.* at 444. The court held that the barge was a vessel even though it was not capable of self-propulsion; was not intended to transport, nor had it ever transported, any people; and lacked the kinds of equipment generally associated with ships. *Id*. at 448–49. The court's decision rested primarily on the ability to move the barge and its sleeping quarters from dredge site to dredge site,

9

which had been done fourteen times in less than two years, and on the temporary nature of its moorings. *Id.* at 448–49.

Since *Stewart*, the Fifth Circuit has not considered whether a floating platform such as the RED HAWK Spar is a vessel under the Jones Act. *Scroggs v. Bis Salamis, Inc.*, Civ. A. No. 1:09-CV-1007, 2010 WL 3910563, at \*6 (E.D. Tex. Oct. 5, 2010). Most courts in this circuit to consider the issue have held that *Stewart* has not changed the consistent result that a spar such as the RED HAWK is not a vessel under the Jones Act. In 2007, a court in this district examined considered whether a platform was a vessel under the Jones Act in *Jordan v. Shell Oil Co.*, No. G-06-265, 2007 WL 2220986 (S.D. Tex. Aug. 2, 2007). Although the platform at issue floated on the water's surface, 16 "tendons" attached the platform to pilings that reached 396 feet into the subsea soil. *Id.* at \*2. Six pipelines extended from the platform, making "[a]ny contemplated movement a . . . massive engineering feat requiring up to two years of engineering and deconstruction." *Id.* Following *Jordan*, a court in the Eastern District of Texas held in a pair of decisions that the THUNDER HORSE, another floating oil-production spar in the Gulf of Mexico, was not a vessel. *Scroggs*, 2010 WL 3910563, at \*6; *Moore v. Bis Salamis, Inc.*, — F. Supp. 2d —, 2010 WL 3745023, at \*6 (E.D. Tex. Sept 20, 2010). The main portion of the THUNDER HORSE Spar was towed to its offshore location. *Scroggs*, 2010 WL 3910563, at \*6; *Moore*, 2010 WL 3745023, at \*6. At that point, its owner "extensively modified" it to attach it to the ocean floor. *Scroggs*, 2010 WL 3910563, at \*6; *Moore*, 2010 WL 3745023, at \*6. Sixteen chain-mooring lines connected to sixteen suction piles extending ninety feet into the ocean floor to anchor the spar. *Scroggs*, 2010 WL 3910563, at \*6; *Moore*, 2010 WL 3745023, at \*6. Two production pipelines, risers, water-injection lines, and umbilical control lines also spread out across the ocean floor. *Scroggs*, 2010 WL

3910563, at *6; *Moore*, 2010 WL 3745023, at *6.  The court concluded that although the THUNDER HORSE was capable of lateral movement within a 350 feet maximum radius for the purpose of servicing a group of closely-packed wellheads around the drill center, *id*. at *7, the limited range of motion was merely incidental to its function as a work platform and did "not render it practically capable of maritime transportation." *Id*. at *8.  The court concluded that THUNDER HORSE was a work platform permanently attached to the seabed and not a Jones Act vessel. *Id*.  As a result, the defendant's removal was found to be proper and plaintiff's motion to remand was denied. *Id*.

One court determined that a claim that a spar was a Jones Act vessel survived summary judgment, even though the plaintiff did not dispute that the platform had been "moored permanently" for six years since its deployment and there were no plans to move it. *Nottingham v. Murphy Oil USA, Inc.*, Civ. A. No. 07-4211, 2009 WL 50160, at *2 (E.D. La. Jan. 7, 2009).  The court noted the following "vessel characteristics": movement between wellheads while moored, classification as an "industrial vessel" by the Coast Guard, and a "Transit Mode" that allowed it to be towed when unmoored. *Id.*  The court did not attempt to reconcile its holding with *Stewart*'s statement that a "permanently moored" vessel is not a vessel under the Jones Act. *See* 481 U.S. 495.

### III.  Analysis

Based on the cases discussed above and the record evidence of the RED HAWK Spar's structure, purpose, and features, this court finds and concludes that the RED HAWK Spar is not a Jones Act vessel.  Although the Spar floats, it is permanently moored by six mooring lines that are attached to 18-foot anchors deeply embedded into the sea floor under 5,000 feet of water.  The mooring lines are 78 feet long.  Steel flow lines and export pipelines further attach the Spar to

extraction points in one direction and to an onshore production facility in Louisiana, by way of another platform, in another direction. The RED HAWK Spar is permanently affixed to the sea floor and can only be moved after detaching the substantial moorings and pipelines that have been joined to its structure. The relocation study and the evidence as to the Spar's intended and actual design, structure, and use show only a theoretical possibility of moving the RED HAWK Spar to a different part of the Gulf of Mexico, not a present capability. The relocation study shows that moving the Spar would involve detaching all the moorings and severing the pipelines; would take nearly two months; would cost over $42 million; and would require abandoning the mooring system and building a new mooring system at the new site. The relocation study shows at most that the RED HAWK Spar is theoretically capable of maritime transportation but not practically capable. It is permanently moored to the sea floor, has been in one place since it was built in 2004, and there is no intention to move it. *See Pavone*, 52 F.3d at 570 (holding that an offshore gambling boat was not a Jones Act vessel even though it could be unmoored and moved to safety before hurricanes); *see also Stewart*, 543 U.S. at 494 (citing *Pavone* with approval).

The evidence Mendez cites does not change this result. Mendez notes that the RED HAWK Spar carries life jackets, ring buoys, and inflatable rafts, all essential safety equipment that is carried on vessels. The safety equipment does not weigh in favor of finding that the RED HAWK Spar is a vessel in this context; instead, it is what one would expect to find on a stationary structure sitting in deep water 120 miles from the coast. Mendez notes that a ballast-control officer is always on board to keep the Spar in its "intended position." But the need to maintain the Spar's stability in often-rough seas does not make it capable of transportation. *See Cope*, 119 U.S. at 627 ("The fact that it floats on the water does not make it a ship or vessel . . . .").

12

The cases on which Mendez relies are consistent with this holding. The uncontroverted summary judgment evidence shows that the RED HAWK Spar's moorings are considerably more permanent than those of the barge in *Holmes*. 437 F.3d at 449 (noting that the barge was "generally moored with anchors as well as land lines"). *Jones v. Francis Drilling Fluids, Ltd.*, 642 F. Supp. 2d 643 (S.D. Tex. 2009), is also consistent. *Jones* concluded that a semisubmersible drilling barge was vessel under the Jones Act, even though it had rested in one place on a marsh bottom for nearly a year. *Id.* at 661. Unlike the RED HAWK Spar, the drilling barge at issue in *Jones* was not connected to the ground by heavy moorings sunk deep in the seabed or attached by pipelines to the shore. There was "no evidence that [the rig] was permanently moored." *Id.* Instead, it "rested on the bottom of Bayou Carlin." *Id.* at 662. The evidence in *Jones* showed the submersible drilling rig to be much more capable of maritime transportation than the RED HAWK Spar.

**IV.    Conclusion**

As a matter of law, the RED HAWK Spar is not a Jones Act vessel. Mendez is not a Jones Act seaman. Mendez's motion to remand is denied.

SIGNED on November 9, 2010, at Houston, Texas.

                                                         _____
                                                                     Lee H. Rosenthal
                                                              United States District Judge